| | |
|---|---|
| JARED M. VILLERY,<br><br>　　　　　Plaintiff,<br><br>　v.<br><br>B. SANDERS, *et al.*,<br><br>　　　　　Defendants. | Case No. 1:18-cv-01067-DAD-JDP<br><br>SCREENING ORDER<br><br>FINDINGS AND RECOMMENDATIONS THAT PLAINTIFF PROCEED ON COGNIZABLE CLAIMS AND THAT NON-COGNIZABLE CLAIMS BE DISMISSED WITH LEAVE TO AMEND<br><br>OBJECTIONS DUE IN 14 DAYS<br><br>ECF No. 1 |

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

Plaintiff Jared M. Villery is a state prisoner proceeding without counsel in this civil rights action brought under 42 U.S.C. § 1983. Plaintiff's complaint, filed August 9, 2018, is before the court for screening under 28 U.S.C. § 1915A. We find that plaintiff has stated claims against defendants Machado, Coontz, Gibbons, and Alatorre for retaliation, but that plaintiff has failed to state a claim against defendant Sanders, or any other defendant, for due process violations. We recommend that the cognizable claims against defendants Machado, Coontz, Gibbons, and Alatorre be allowed to proceed and that all other claims be dismissed without prejudice.

1

## I. SCREENING AND PLEADING REQUIREMENTS

A district court is required to screen a prisoner's complaint that seeks relief against a governmental entity, its officer, or its employee. *See* 28 U.S.C. § 1915A(a). The court must identify any cognizable claims and dismiss any portion of the complaint that is frivolous or malicious, that fails to state a claim upon which relief may be granted, or that seeks monetary relief from a defendant who is immune from such relief. *See* 28 U.S.C. §§ 1915A(b)(1), (2). The court must construe an unrepresented litigant's complaint liberally. *Haines v. Kerner*, 404 U.S. 519, 520 (1972) (per curiam).

A complaint must contain a short and plain statement that plaintiff is entitled to relief, Fed. R. Civ. P. 8(a)(2), and provide "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The short and plain statement "need only give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (quoting *Twombly*, 550 U.S. at 555 (internal quotation marks omitted)). The complaint need not identify "a precise legal theory." *Kobold v. Good Samaritan Reg'l Med. Ctr.*, 832 F.3d 1024, 1038 (9th Cir. 2016) (quoting *Skinner v. Switzer*, 562 U.S. 521, 530 (2011)). The plausibility standard does not require detailed allegations, but legal conclusions do not suffice. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). If the allegations "do not permit the court to infer more than the mere possibility of misconduct," the complaint states no claim. *Id.* at 679.

## II. STATEMENT OF FACTS[1]

Plaintiff was an inmate at California Correctional Institution ("CCI") during the relevant timeframe. ECF No. 1 at 3. Defendants are employees at CCI. *Id.* Plaintiff arrived in CCI in 2014 and soon "began to experience constant harassment and threats aimed at him by multiple [CCI] staff members." *Id.* at 4. Plaintiff had a reputation as "an avid litigator." *Id.* On July 27, 2014, plaintiff submitted a grievance against officers Lindsey, Stewart, and Miller. *See id.* "He

---

[1] We draw the following facts from plaintiff's complaint, ECF No. 1, and accept them as true for screening purposes. Plaintiff refers to himself as Villery, and we adopt that nomenclature in the quoted portions of the complaint below.

2

filed another grievance on August 11, 2014, . . . against CCI staff members Schmidt, Escarcega, Yerton, and Nelson." *Id.*

### A. False Charge for Possession of Dangerous Contraband

On August 19, 2014, . . . Defendant Gibbons targeted Villery's cell for a retaliatory cell search, while the evening meal was taking place. Gibbons is a close friend of officer Stewart, who was the subject of Villery's July 27, 2014 grievance. Importantly, at that time Gibbons was assigned to a Security and Escort post, and was not supposed to be inside any of the housing units on Facility C; instead he was supposed to be outside of the housing units, observing inmates as they walked to and from the chow hall. Under CDCR policy, only the officers who were assigned to work in the housing units were responsible for conducting cell searches.

Upon returning to his cell from the chow hall, Villery discovered that his cell had been searched and left in shambles. He observed that all of his legal materials had been strewn all over the cell floor, and many of the documents had dirty boot prints on them. Further, Villery immediately noticed that two specific documents had been separated from his other legal documents, and had carefully been placed on top of his mattress. One was a printout of a docket sheet related to a civil action Villery had pending against the CDCR, and the other was a notice that he had received reflecting that his grievance against officer Stewart, Lindsey, and Miller had been proceed in August 11, 2014. On the docket sheet, Gibbons had written the words "Drop it" at the top of the page, and had scrawled a large "X" across the entire sheet.

Villery was unaware of what had provoked this action against him, until Gibbons approached his cell door approximately thirty minutes later. Gibbons stated that he had allegedly found a loose razor blade in Villery's locker while searching the cell. However, Villery had no such razor blade in his cell, and he stated so to Gibbons. Gibbons then smirked at Villery and handed him a cell search receipt, stating that he would be receiving a disciplinary report for having a razor blade. As Gibbons was walking away from Villery's cell, he stated "now you'll learn to leave shit alone around here."

On August 21, 2014, Villery was issued a serious disciplinary report for possession of dangerous contraband, written by Gibbons, stemming from the search of Villery's cell on August 19, 2014. When Villery was issued the first copy of this report, he specifically informed the issuing officer that he wanted Gibbons called as a witness at the hearing, which the officer recorded on the report.

*Id.* at 4-5 (paragraph numbers omitted).

### B. September 4, 2014 Disciplinary Hearing

On September 3, 2014, Villery filed a grievance against Gibbons for issuing him a fabricated disciplinary report. The very next day, Defendant Machado conducted a hearing on the report filed by Gibbons. Preliminarily, prior to this hearing, Villery had been confronted by Machado on April 23, 2014, about his complaints against a Captain and Sergeant. At that time, Machado had berated him for filing grievances against staff, especially the facility Captain, stating that Villery wasn't "going to last long at CCI." Further, as a result of Machado's actions, on May 14, 2014 Villery sent a letter to CCI Warden Kim Holland complaining about Machado's behavior.

On September 4, 2014, Villery arrived to his disciplinary hearing with a written defense statement and witness request for Gibbons, with prepared questions, as well as copies of the documents Gibbons had left on his mattress during the cell search. Villery identified to Machado what each of the documents were, and handed a set of them to Machado. Villery also verbally asked Machado that Gibbons be called as his only witness. After merely glancing at the documents, Machado became hostile, stating that Villery was trying to overcomplicate the hearing and "make problems for my officer [Gibbons]."

Villery attempted to explain that he was only trying to prove his own innocence, describing how Gibbons' actions were directly in retaliation for his actions. Villery referenced Gibbons' comment about how the false charges would teach him "to leave shit alone" at CCI, and he mentioned the fact that he had filed a complaint against Gibbons the day before about this misconduct. However, Machado tossed the documents back at Villery, and stated that he was already aware of the "garbage" that Villery had filed against Gibbons. When Villery persisted on and tried to explain his defense further, Machado cut him off, and said that he didn't "give a shit" about Villery's documents or defense, and he stated that he was not going to call any witness for Villery. Machado then stated that Villery was guilty, and ordered him to "get the fuck back to your cell."

On October 1, 2014, Villery discovered the extent of Machado's retaliation against him, when he received his final copy of the disciplinary report, which was supposed to describe the events that took place during the hearing on September 4, 2014. Despite Villery's documented request to call Gibbons, prior to and during the hearing (as well as a written notification to defendant Sanders memorializing Machado's refusal to call Villery's desired witness, submitted on September 28, 2014), in the final report Machado falsely recorded that the box on the initial report, which was used to document Villery's request for a witness when the report was first issued, had been accidently marked by the issuing officer. Machado went on to further claim that, during the hearing, Villery never requested any witnesses, and didn't desire to have any called.

This finding of guilt resulted in a loss of thirty days of good time credit, Villery's removal from his job assignment, and his placement on C-status (a highly restrictive disciplinary classification, far more punitive than ASU) for 150 days. Villery challenged this finding of guilt through a grievance, leading to a reversal and new hearing based on Machado's denial of Villery's requested witness. At the re-hearing, Villery was found guilty of a lesser charge after being allowed to call Gibbons as a witness. Although Villery's good time was reinstated, he was still forced to serve the entire 150 days on C-status before the re-hearing took place, and he never received his job back.

*Id.* at 5-7 (paragraph numbers omitted).

**C. False Charge for Disobeying a Direct Order**

On September 10, 2014, during an unrelated disciplinary hearing, Villery complained to one Sergeant Fidler about how his housing unit staff were refusing to allow him to work at his assigned job position. Villery presented evidence to Fidler showing how his housing officers had falsified his work logs. Immediately after the hearing, Fidler called defendant Alatorre, who was working in the control tower of Villery's housing unit (Unit Two), and ordered that Villery's personal appliances be confiscated, and that Villery be prevented from entering the housing unit until after the confiscation was complete. Fidler then began laughing on the phone, telling Alatorre that Villery was "over here snitching on you guys, saying you won't let him work." (Alatorre was one of the officers who regularly worked in Unit Two).

4

Shortly after Fidler's conversation with Alatorre, Villery arrived back to Unit Two, where he was made to wait outside. While waiting, Alatorre opened the control tower window and told Villery "you messed up, you should have kept your mouth shut, the Sergeant won't help you." A few minutes later Alatorre allowed Villery back into the Unit, which is when he discovered that all of his electronic appliances had been confiscated, but that no receipt had been left documenting this fact.

Villery approached the office in Unit Two, where the floor officers were, and requested a receipt for his confiscated property from Officer Blankenship. Although Villery stopped approximately six feet from the office door before addressing the officer, Alatorre began screaming at him from the control booth to back up.

Villery immediately stepped farther away from the office as ordered, while Blankenship informed him that he would be provided a receipt as soon as it was filled out. Villery thanked Blankenship, and turned away from the office in order to return to his cell. However, Alatorre became very hostile, yelling at Villery again to back up. Villery asked Alatorre to calm down, and stated that he had finished inquiring about his receipt and was already going back to the cell.

In response, Alatorre activated his emergency alarm, and told all the staff who responded that Villery had refused to return to his cell. Two days after this incident, Alatorre filed a disciplinary report against Villery for allegedly "Delaying a Peace Officer in the Performance of his Duties." In his report, Alatorre falsely claimed that Villery had disobeyed an order to return to his cell and allegedly had told Alatorre to "shut the fuck up" in response to the order.

*Id.* at 7-9 (paragraph numbers omitted).

**D. September 23, 2014 Disciplinary Hearing**

On September 23, 2014, the disciplinary hearing on Alatorre's charges was conducted by Defendant Coontz. Villery came to the hearing with a written defense statement, as well as witness requests with prepared questions for Officers Alatorre and Blankenship, and inmates Hardin and Veal.

Prior to this hearing, Villery had never met or had any contact with Coontz, which led him to believe that he could seek help from Coontz to address the extensive harassment and retaliation that he had been experiencing. So before the hearing started, Villery began explaining to Coontz about how his housing officers were falsifying his work logs and refusing to let him work at his job assignment. He informed Coontz that he had recently filed an appeal about this issue on September 17, 2014, but that he was hoping Coontz could intervene sooner.

Rather than provide Villery with assistance, Coontz responded by stating that he was aware of Villery's "bitching" and that all Villery was doing was making unsupported allegations. He said that Villery was a liar, and then accused him of being "a problem, complaining all the time about nothing."

Villery's hearing began on the heels of Coontz's outburst. After reading the report, Coontz demonstrated his predetermined belief in Villery's guilt. Coontz stopped reading at the portion of the report which indicated that Villery had appeared angry during the incident. At that point, Coontz stated, "I know you were angry that day when you left the hearing with Sgt. Fidler because I was in the office and saw you."

When Villery learned about Coontz's beliefs, he immediately requested that Coontz recuse himself from holding the hearing, explaining that the allegation of him being angry during the incident being reviewed was an aspect of the charge, and that Coontz's independent opinion about Villery's emotional state at that time

5

amounted to a predetermined belief in his guilt. Despite this, Coontz stated that he was going to hear the charge regardless of whether Villery liked it or not.

Coontz then reviewed Villery's witness requests, and stated that while he would allow the officers to be called, he had a problem with inmate witnesses and would not call either of the ones requested by Villery. Villery explained that both inmates were crucial to his defense, because they were both eyewitnesses to the incident at issue. When Coontz responded that inmates will just lie for each other, Villery still persisted on, attempting to compromise, asking that Coontz at least call inmate Veal, who was closer to Villery when the incident with Alatorre took place and had seen everything. Nevertheless, Coontz still refused to call either inmate.

Then, when officers Alatorre and Blankenship were called during the hearing, Coontz refused to ask five of the seventeen pre-prepared questions that Villery sought to ask them. Moreover, during the questioning of Blankenship, he stated that he couldn't hear what was said between Villery and Alatorre, despite the fact that Villery was standing just six feet from him at the time. So Villery sought to ask him this follow up question: "since I was standing only six feet away from you at the time, wouldn't you have been able to hear if I was yelling at Alatorre or using profanity?" However, Coontz refused to allow this question.

As a direct result of the improper restrictions on Villery's defense, Coontz found him guilty, stating "You're a pain in the ass and I know you were angry that day, you were threatening and walking toward the office, and that led my officer to activate his alarm. You're guilty, and will be placed on C-status for ninety days."

The fact that Coontz's decision was motivated by retaliation was clarified further when Villery received the final copy of the disciplinary report on October 7, 2014, which was supposed to detail exactly what occurred at the hearing on September 23, 2014. In direct contravention to the truth, and in an effort to justify his improper refusal to call Villery's inmate witnesses, Coontz fabricated portions of the hearing report. Despite the fact that Villery had clearly and repeatedly informed Coontz that inmates Veal and Hardin were direct eyewitnesses to the event with Alatorre (and had also notified Defendant Sanders of this fact in a letter sent September 28, 2014), in the report Coontz falsely alleged that during the hearing Villery had stated that both Veal and Hardin were in their cells during the incident. This direct lie was used by Coontz to clam that neither inmate could have been an eyewitness, using this as his documented reason for refusing to call either inmate as a witness.

This finding of guilt led to a loss of ninety days of good time credit, Villery's placement on C-status for 150 days, and his removal from his job assignment. Through a grievance, Villery succeeded in having this finding of guilt set aside, and the charges dismissed, based on the violation of Villery's due process right to witnesses and insufficiency of the evidence. While his good time was restored, by that time he had already completed his five months on C-status, and was never reinstated to his job position.

*Id.* at 9-11 (paragraph numbers omitted).

**E. Review of Disciplinary Hearings**

In light of the due process violations committed by defendants Coontz and Machado, at the disciplinary hearings on September 4 and 23, 2014, respectively, Villery wrote a letter addressed to Associate Warden ("AW") Schuyler on September 28, 2014, which was forwarded to Defendant Sanders who had replaced Mr. Schuyler. This letter outlined the due process violations described above.

As the Chief Disciplinary Officer at CCI, Sanders was personally responsible for reviewing all disciplinary findings of guilt to ensure that all due

process rights had been provided to the affected inmates. With this power, Sanders also had the authority and duty to reverse, order a new hearing, or dismiss any findings of guilt that were derived from hearings where due process had been denied. Despite his duties, and being placed on notice of the due process violations experienced by Villery through the September 28, 2014 letter (which Villery has proof of that he received that letter), Sanders still approved both findings of guilt that were rendered by Coontz and Machado.

The same violations identified in Villery's letter were later relied upon to reverse these findings of guilt when Villery pursued grievances about the hearings. However, because Sanders allowed the findings to stand, while fully aware that they were made in violation of Villery's due process rights, Villery was forced to endure five months of C-status, and he was removed from his job assignment.

*Id.* at 11-12 (paragraph numbers omitted).

### F. Threatening Remarks in the Library

Because his housing unit officers had continued to falsify his work logs and prevent him from working during this same time period, Villery had submitted the September 17, 2014 grievance, which had led to Coontz's actions. He had also submitted a grievance on October 1, 2014, about other acts of retaliation by non-defendants. Both of these appeals were subsequently assigned to Coontz for review.

On October 15, 2014, while Villery was in the facility library conducting research, Coontz came into the library and interviewed him about the two above grievances. Coontz was immediately hostile, saying that Villery was "full of shit, you keep filing this bullshit. Now I have to waste my time talking to an asshole." Instead of engaging Coontz, Villery attempted to provide new supporting documents as evidence in support of his grievances; however, Coontz said that he didn't want "one more piece of paper from you. It's obvious you got over on my staff, and were out where you weren't supposed to be."

Villery tried to correct Coontz and explain why he was incorrect, but Coontz abruptly cut him off, stating "I'm not buying it. You think you know it all, filing appeals constantly about every little thing. Well, I'm going to make sure that my officers book you for anything you do. If you're out of bounds, we're going to book you. If you talk back to my officers, we're going to book you. We're going to book you for any reason we can find."

Villery responded to this berating by stating that it was obvious Coontz had decided which party was wrong before the interview even began, and that he was done speaking with Coontz. However, Coontz wasn't finished, and in an effort to further portray Villery as the problem, he referenced a different disciplinary report that his housing unit officer had filed against him just days after Villery filed one of the grievances against that officer. Villery countered this by pointing out the retaliatory and fabricated nature of that charge, and referenced how it was very similar to how Coontz had falsified the report from Villery's disciplinary hearing on September 23, 2014.

Villery's statement seemed to enrage Coontz, who then raised his voice and advanced on Villery, stating "you're the one who keeps doing everything wrong, and we're going to keep writing you up for it. If that doesn't work, and you keep on filing this bullshit, I'm just going to have you locked up." (meaning placed in ASU).

*Id.* at 12-13 (paragraph numbers omitted).

## III. DISCUSSION

Section 1983 allows a private citizen to sue for the deprivation of a right secured by federal law. *See* 42 U.S.C. § 1983; *Manuel v. City of Joliet, Ill.*, 137 S. Ct. 911, 916 (2017). To state a claim under 42 U.S.C. § 1983, a plaintiff must (1) allege the deprivation of a right secured by the U.S. Constitution and laws of the United States, and (2) show that the alleged deprivation was committed by a person acting under color of state law. *See West v. Atkins*, 487 U.S. 42, 48 (1988). A person deprives another of a constitutional right, "within the meaning of § 1983, 'if he does an affirmative act, participates in another's affirmative act, or omits to perform an act which he is legally required to do that causes the deprivation of which complaint is made.'" *Preschooler II v. Clark Cty. Sch. Bd. of Trs.*, 479 F.3d 1175, 1183 (9th Cir. 2007) (quoting *Johnson v. Duffy*, 588 F.2d 740, 743 (9th Cir. 1978)).

### A. Procedural Due Process

Plaintiff claims that his liberty interest in freedom from punishment without due process was violated when his hearing resulted in C-status and the loss of his job assignment, along with the loss of good time credits, which were reinstated on appeal. The Due Process Clause protects individuals from deprivations of liberty without due process of law. U.S. Const. amend. XIV. A procedural due process claim consists of two parts: (1) a life, liberty, or property interest that has been subject to interference by the state; and (2) constitutionally insufficient procedures attendant upon the deprivation. *Kentucky Dept. of Corrections v. Thompson*, 490 U.S. 454, 460 (1990). "'[L]awfully incarcerated persons retain only a narrow range of protected liberty interests.'" *Chappell v. Mandeville*, 706 F.3d 1052, 1062-63 (9th Cir. 2013) (quoting *Hewitt v. Helms*, 459 U.S. 460, 467 (1983)) (concluding that temporary contraband watch did not give rise to a liberty interest under the Due Process Clause of the Fourteenth Amendment).

When deciding whether the Constitution itself[2] protects an alleged liberty interest of a

---

[2] The state, in addition to the Constitution, may create a liberty interest, but that is not alleged by plaintiff or at issue in this case. *See Chappell*, 706 F.3d at 1064 ("[T]o find a violation of a state-created liberty interest the hardship imposed on the prisoner must be 'atypical and significant . . . in relation to the ordinary incidents of prison life.'" (quoting *Sandin*, 515 U.S. at 483-84)); *see also Wyatt v. Swearingen*, No. C 06-4228 RMW (PR), 2010 WL 135322, at *8 (N.D. Cal. Jan. 5, 2010) ("Although plaintiff no doubt experienced some difficulties in being assigned to Privilege

8

prisoner, the court should consider whether the practice or sanction in question "is within the normal limits or range of custody which the conviction has authorized the State to impose." *Meachum v. Fano*, 427 U.S. 215, 225 (1976). The Constitution does not grant prisoners a liberty interest in remaining in general population, *see Sandin v. Connor*, 515 U.S. 472, 485-86 (1995) *and Hewitt v. Helms*, 459 U.S. 460, 468 (1983); in not losing privileges, *see Baxter v. Palmigiano*, 425 U.S. 308, 323 (1976); in staying at a particular institution, *see Meachum*, 427 U.S. at 225-27; or in remaining in a prison in a particular state, *see Olim v. Wakinekona*, 461 U.S. 238, 245-47 (1983). *See also Chappell v. Mandeville*, 706 F.3d 1052, 1062-63 (9th Cir. 2013) (concluding that a temporary contraband watch did not give rise to a liberty interest under the Due Process Clause of the Fourteenth Amendment).

Plaintiff argues that his due process rights were violated because he was placed on "C-status"[3] for five months and lost his job assignment, even though the charges were dismissed and his good time credits were reinstated. The privileges plaintiff claims to have lost are not the sorts of liberty interests that could give rise to a due process violation for an imprisoned person. Additionally, plaintiff does not have a liberty interest in the hearing or processing of his appeal because he is not entitled to a specific grievance procedure under the Due Process Clause. *See Ramirez v. Galaz*, 334 F.3d 850, 860 (9th Cir. 2003). Accordingly, plaintiff's procedural due process claims against defendants Sanders, Machado, and Coontz must fail. Out of an abundance

---

Group C status for over a year, there is no indication that he suffered an atypical and significant hardship relative to the ordinary conditions of prison life.").

[3] C-status, we infer, refers to placement in Privilege Group C, in which prisoners are subject to the following privilege restrictions:

(A) No family visits.
(B) One-fourth the maximum monthly canteen draw as authorized by the secretary.
(C) Telephone calls on an emergency basis only as determined by institution/facility staff.
(D) Yard access limited by local institution/facility security needs. No access to any other recreational or entertainment activities.
(E) No inmate packages. Inmates may receive special purchases, as provided in subsections 3190(j) and (k).

Cal. Code Regs. tit. 15, § 3044(f)(2).

9

1 of caution, we recommend dismissal without prejudice and that plaintiff be given leave to amend his complaint.

### B. Retaliation in Violation of the First Amendment

Plaintiff alleges multiple instances of retaliation against his efforts to pursue grievances and litigation. Retaliation by a state actor for a prisoner's exercise of a constitutional right is actionable under 42 U.S.C. § 1983 because retaliatory actions may chill individuals' exercise of constitutional rights. *See Perry v. Sindermann*, 408 U.S. 593, 597 (1972). In the prison context, a "viable claim of First Amendment retaliation entails five basic elements: (1) an assertion that a state actor took some adverse action against an inmate (2) because of (3) that prisoner's protected conduct, and that such action (4) chilled the inmate's exercise of his First Amendment rights, and (5) the action did not reasonably advance a legitimate correctional goal." *Rhodes v. Robinson*, 408 F.3d 559, 567-68 (9th Cir. 2005) (footnote omitted). Accordingly, a prisoner suing prison officials under § 1983 for retaliation must allege that he was retaliated against for exercising his constitutional rights and that the retaliatory action did not advance legitimate penological goals, such as preserving institutional order and discipline. *See Pratt*, 65 F.3d at 806.

Plaintiff has stated a cognizable First Amendment retaliation claim against defendants Machado, Coontz, Gibbons, and Alatorre. Plaintiff alleges that defendant Gibbons trashed plaintiff's cell and filed fabricated disciplinary charges against him to coerce plaintiff to drop previous grievances and a civil action. Plaintiff alleges that defendant Machado prevented him from having a full hearing on a disciplinary issue in retaliation for plaintiff's grievances against staff. Plaintiff alleges that defendant Alatorre falsely accused plaintiff of misconduct in retaliation for plaintiff's complaints against Alatorre and his coworkers. Plaintiff alleges that defendant Coontz committed retaliation twice: 1) when Coontz found Villery guilty at a disciplinary hearing and falsified the hearing report in retribution for plaintiff's grievances against CCI staff; and 2) when Coontz threatened plaintiff with false disciplinary charges in response to plaintiff's pursuit of grievances. Although plaintiff does not allege that his protected activity was actually stopped, a chilling effect on the exercise of his rights may be inferred from the facts given the liberal interpretation provided when evaluating a prisoner's pro se complaint. *See*

*Rhodes*, 408 F.3d at 569. Thus, plaintiff has satisfied each of the five elements of *Rhodes* at this stage. *See Rhodes*, 408 F.3d at 567-68.

**IV.     CONCLUSION**

Plaintiff has stated retaliation claims against defendants Machado, Coontz, Gibbons, and Alatorre. However, plaintiff has failed to state any due process claims against defendants Sanders, Machado, or Coontz. Therefore, plaintiff may wish to amend his complaint. Should plaintiff choose to amend the complaint,[4] the amended complaint should be brief, Fed. R. Civ. P. 8(a), but must state what actions each named defendant took that deprived plaintiff of constitutional or other federal rights. *See Iqbal*, 556 U.S. at 678; *Jones v. Williams*, 297 F.3d 930, 934 (9th Cir. 2002). Plaintiff must set forth "sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570). There is no *respondeat superior* liability, and each defendant is only liable for his or her own misconduct. *See id.* at 677. Plaintiff must allege that each defendant personally participated in the deprivation of his rights. *See Jones*, 297 F.3d at 934. Plaintiff should note that a short, concise statement in which the allegations are ordered chronologically will help the court identify his claims. Plaintiff should describe how each defendant wronged him, the circumstances surrounding each of the claimed violations, and any harm he suffered.

If plaintiff decides to file an amended complaint, the amended complaint will supersede the original complaint, *Lacey v. Maricopa County*, 693 F. 3d 896, 907 n.1 (9th Cir. 2012) (en banc), and the amended complaint must be complete on its face without reference to the prior, superseded pleading, *see* E.D. Cal. Local Rule 220. Once an amended complaint is filed, the original complaint no longer serves any function. Therefore, in an amended complaint, as in an original complaint, plaintiff must assert each claim and allege each defendant's involvement in sufficient detail. The amended complaint should be titled "First Amended Complaint" and refer to the appropriate case number.

---

[4] Plaintiff may not change the nature of this suit by adding new, unrelated claims or new, unrelated defendants in his amended complaint. *See* Fed. R. Civ. P. 18; *George v. Smith*, 507 F.3d 605, 607 (7th Cir. 2007) ("Unrelated claims against different defendants belong in different suits . . . .").

11

## V. FINDINGS AND RECOMMENDATIONS

The undersigned has screened plaintiff's complaint and finds that plaintiff states retaliation claims against defendants Machado, Coontz, Gibbons, and Alatorre. We recommend that the court allow plaintiff to proceed on these claims and dismiss without prejudice all other claims, namely plaintiff's due process claims against defendants Sanders, Machado, and Coontz.

These findings and recommendations are submitted to the U.S. district judge presiding over the case under 28 U.S.C. § 636(b)(1)(B) and Local Rule 304. Within fourteen days of the service of the findings and recommendations, the parties may file written objections to the findings and recommendations with the court and serve a copy on all parties. That document must be captioned "Objections to Magistrate Judge's Findings and Recommendations." The presiding district judge will then review the findings and recommendations under 28 U.S.C. § 636(b)(1)(C).

IT IS SO ORDERED.

Dated:   May 8, 2019                             _____
                                                 UNITED STATES MAGISTRATE JUDGE

No. 204